**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KAREN SEAMAN, Individually, and** | : | **CIVIL ACTION** |
| **As Guardian on behalf of C.S. and J.S.,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CAROLYN W. COLVIN,** | : | **NO.  13-6479** |
| **Acting Commissioner** | : | |
| **of Social Security,** | : | |
| **Defendant.** | : | |

<u>**MEMORANDUM**</u>

RESTREPO, J.                                                                                    AUGUST 31, 2015

Plaintiff, Karen Seaman, individually and as Guardian on behalf of her minor children, C.S. and J.S., filed this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied plaintiff's applications for mother's insurance benefits on her own behalf and child's survivor insurance benefits on behalf of C.S. and J.S. as the children of a deceased wage earner.  Before the Court are plaintiff's brief in support of her request for review of the Commissioner's denial of benefits (ECF Document 41), defendant Commissioner's Response thereto (Document 44), and the parties' respective reply briefs (Docs. 44 & 45).  For the reasons which follow, the Commissioner's final decision denying plaintiff's applications for benefits is affirmed.

1.  **BACKGROUND**

The parties have stipulated to the material facts of this case.  *See* Stipulated Facts (Doc. 40).  Plaintiff and her deceased husband, Trevor Seaman, were married on January 6, 2001.

Shortly before their marriage, in November 2000, Mr. Seaman was diagnosed with Hodgkin's Lymphoma.  Due to the risk of infertility that could be caused by chemotherapy and subsequent cancer treatments, Mr. Seaman cryopreserved sperm prior to starting his treatments in November 2000.

In May 2005, plaintiff and Mr. Seaman underwent *in vitro* fertilization ("IVF"), resulting in ten embryos, and out of the ten embryos, six were frozen.  The couple signed a waiver form which stated that if either party were to die, the other would become the "owner" of the frozen embryos.  As a result of the IVF procedure, plaintiff became pregnant with one child.

Tragically, on September 29, 2005, Mr. Seaman passed away.  Mr. Seaman had been domiciled in Pennsylvania at the time of his death.  Sadly, plaintiff's pregnancy resulted in a stillbirth at 37 weeks.  Nearly four years after Mr. Seaman's death, on August 23, 2009, two of the frozen embryos were transferred to plaintiff's uterus, and plaintiff subsequently gave birth to C.S.

On May 27, 2010, plaintiff filed two separate applications with the Social Security Administration ("SSA") under Title II and Part A of Title XVII of the Act, respectively: one on behalf of herself, for mother's insurance benefits; and the other on behalf of C.S., for child's survivor insurance benefits.  Both applications were denied initially and on reconsideration, and on March 2, 2012, plaintiff requested an administrative hearing on both applications.

Meanwhile, following frozen embryo transfer ("FET") of some of the remaining aforementioned frozen embryos, plaintiff gave birth to J.S.  On June 11, 2013, plaintiff filed two additional separate applications for social security insurance benefits: one on behalf of herself for mother's insurance benefits; and one on behalf of J.S. for child's insurance benefits.

On July 12, 2013, a hearing was held before an Administrative Law Judge ("ALJ").  The ALJ issued a decision dated August 16, 2013 finding that Karen Seaman and C.S. were not entitled to social security benefits.  The ALJ further found that J.S. was not entitled to social security benefits.  In particular, the ALJ found that neither C.S. nor J.S. was a qualified child for purposes of child's survivor benefits under § 416(e) of the Act.  The ALJ determined that to be so qualified, the claimant must be able to take as an intestate heir of the decedent wage earner under the laws of the state where the wage earner was domiciled at the time of death, and the Pennsylvania intestacy statutes did not recognize as a decedent's heirs children born as a result of posthumously transferred cryopreserved embryos.  Therefore, C.S., J.S., and Karen Seaman were found to be not entitled to child's survivor insurance benefits and mother's insurance benefits, respectively.[1]  On July 9, 2014, the Appeals Council denied plaintiff's request for review, and the ALJ's decision consequently became the final decision of the Commissioner.  *See Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001).

Although plaintiff initiated this civil action prior to the denial of her request for review by the Appeals Council, subsequent to the Appeals Council's denial of review, plaintiff filed an Amended Complaint, the parties filed stipulated facts and their respective briefs, and oral argument was held April 22, 2015.  Plaintiff requests that the Court reverse the ALJ's decision denying benefits, and defendant Commissioner urges the Court to affirm the ALJ's decision.

---

[1] Under 42 U.S.C. § 402(g)(1)(E), mother's insurance benefits are available to a surviving spouse of an individual who died fully insured, if such surviving spouse, among other things, "at the time of filing [an application for such benefits] has in his or her care a child of such individual entitled to a child's insurance benefit."  Therefore, it is undisputed that if it is determined that C.S. and J.S. are not entitled to child's insurance benefits, then plaintiff is also not entitled to mother's insurance benefits.

2.  STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is limited, and this Court is bound by the factual findings of the Commissioner if substantial evidence supports them.  *See Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate."  *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It consists of "more than a mere scintilla" of evidence but may be "less than a preponderance of the evidence."  *Id.* at 118 (quoting *Jesurum v. Secretary of HHS*, 48 F.3d 114, 117 (3d Cir. 1995)).

The ALJ must also follow "proper procedure and apply proper legal standards."  *Coria v. Heckler*, 750 F.2d 245, 247 (3d Cir. 1984).  The Court has plenary review of all legal issues.  *Schaudeck v. Comm'r of SSA*, 181 F.3d 429, 431 (3d Cir. 1999).  Here, the parties agree that there are no material factual issues in dispute, *see, e.g.,* Pl.'s Reply (Doc. 45) at 1 ("As has been stated by both parties, there are no issues of material fact."), and that the issue before the Court is a question of law: whether, under the specific factual circumstances in this case, J.S. and C.S. are entitled to child's insurance benefits and plaintiff is entitled to mother's insurance benefits.

3.  DISCUSSION

A.  Statutory Provisions

The Act provides surviving children of a deceased insured wage earner with benefits pursuant to 42 U.S.C. § 402(d).  In determining whether C.S. and J.S. are qualified children of an insured individual under the Act, the parties agree that the relevant provision is 42 U.S.C. § 416(h)(2)(A), which states: "In determining whether an applicant is the child or parent of a fully . . . insured individual for purposes of this subchapter, the Commissioner of Social Security shall

apply such law as would be applied in determining the devolution of intestate personal property . . . by the courts of the State in which such insured individual is domiciled at the time of his death." *See* Pl.'s Br. (Doc. 41) at 5-6; Def.'s Resp. (Doc. 44) at 4.  There is no dispute that Mr. Seaman was domiciled in Pennsylvania at the time of death, and accordingly, Pennsylvania's intestacy laws apply to plaintiff's case.  Where the parties diverge is the application of Pennsylvania's afterborn-heirs provision to C.S. and J.S.  Pennsylvania's statute provides in relevant part: "Persons begotten before the decedent's death but born thereafter, shall take as if they had been born in his lifetime."  20 Pa. C.S. § 2104(4).

### B.  Interpreting Pennsylvania Intestacy Law

In interpreting state law, federal courts are bound by the decisions of the state's highest court.  *Wirth v. Aetna U.S. Healthcare*, 469 F.3d 305, 309 (3d Cir. 2006).  When there is a novel question of law and no controlling precedent on the issue, courts must "predict how the highest state court would rule."  *Id.* (quoting *Rolick v. Collins Pine Co.*, 925 F.2d 661, 664 (3d Cir. 1991)).  However, federal courts construing state law must take caution and leave to "state courts to decide whether and to what extent they will expand state common law."  *City of Phila. v. Lead Indus. Ass'n, Inc.*, 994 F.2d 112, 123 (3d Cir. 1993).

The Pennsylvania Supreme Court is guided by the rules of statutory construction, which direct the Court to "at all times seek to ascertain and effectuate the legislative intent underlying the enactment of the particular statute(s)."  *Pa. Fin. Responsibility Assigned Claims Plan v. English*, 664 A.2d 84, 87 (Pa. 1995) (citing 1 Pa. C.S. § 1921(a)).  Where the words of a statute are clear and free from ambiguity the legislative intent is to be gleaned from those very words.  *Id.*  However, where the statute is unclear or susceptible to differing interpretations, the Court

must look to other factors, such as the "object to be attained, the circumstances under which [the law] was enacted and any legislative or administrative interpretations thereof." *Id.* (citing *Coretsky v. Bd. of Comm'rs of Butler Twp.*, 555 A.2d 72 (Pa. 1989)).

Moreover, the Court "cannot and should not interpose [its] views on public policy for those of the legislature," and the Court's function is to "interpret statutes, not re-write them." *DiGirolamo v. Apanavage*, 312 A.2d 382, 385 (Pa. 1973). The Court may not "add, by interpretation, to a statute, a requirement which the legislature did not see fit to include." *Shafer Elec. & Const. v. Mantia*, 96 A.3d 989, 994 (Pa. 2014) (quoting *Commonwealth v. Rieck Inv. Corp.*, 213 A.2d 277, 282 (Pa. 1965)). Rather, courts must "listen attentively to what it does not say." *Pilchesky v. Lackawanna Cnty.*, 88 A.3d 954, 965 (Pa. 2014) (citations omitted).

In attempting to predict how the highest state court would rule, "decisions of state intermediate appellate courts, of federal courts interpreting that state's laws, and of other state supreme courts that have addressed the issue" are considered. *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1445 (3d Cir. 1996). Further, federal courts look to "analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue." *Id.* (citing *McGowan v. Univ. of Scranton*, 759 F.2d 287, 291 (3d Cir. 1985)); *see McGowan*, 759 F.2d at 291 (quoting *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 663 (3d Cir. 1980)).

Here, the parties agree that there is no precedent from Pennsylvania or federal courts addressing the treatment, under Pennsylvania intestacy law, of children who were born after posthumous FET. *See* Tr. Oral Arg. 4/22/15 (hereinafter cited as "Oral Arg."), at 6; Def.'s Resp. at 7. Furthermore, the words of the relevant statute are not clear and free from ambiguity, *see English*, 664 A.2d at 87. In particular, it is far from clear that the legislative intent was that

children, born under the circumstances of C.S. and J.S., are "**[p]ersons begotten before the decedent's death**," *see* 20 Pa. C.S. § 2104(4) (emph. added), for purposes of Pennsylvania intestacy law.  Therefore, in predicting Pennsylvania law, the Court must consider other factors, s*ee English*, 664 A.2d at 87.

### (i)    *Legislative History of Pennsylvania's Intestacy Statutes*

Turning foremost to the applicable state statute, the Court considers how the Pennsylvania legislature intended the statute to apply to the circumstances in this case.  One factor which may be considered is legislative history of 20 Pa. C.S. § 2104.[2]  Title 20 Pa. C.S. § 2104(4), the Pennsylvania afterborn-heirs provision, appears to have been modeled after the 1946 Model Probate Code ("MPC"), *see In re Certified Question from U.S. Dist. Court for W. Mich.*, 825 N.W.2d 566, 571 n.5 (Mich. 2012) (Kelly, J., Concurring) (citing Benjamin C. Carpenter, *A Chip Off the Old Iceblock: How Cryopreservation Has Changed Estate Law, Why Attempts to Address the Issue Have Fallen Short, and How to Fix It*, 21 Cornell J.L. & Pub. Pol'y 347, 362 (2011) (providing historical background and detailed summaries of state statutes and court rulings regarding inheritance rights of children who were not in gestation until after the father's death due to assisted reproductive technology)).  Although Pennsylvania's statute does

---

[2] "The Statutory Construction Act specifically authorizes consideration of legislative history when construction of a statute, beyond its plain language, is required."  *Arneson v. Wolf*, --- A.3d ---, 2015 WL 3609334, *7 n.10 (Pa. Commw. June 10, 2015) (citing 1 Pa. C.S. § 1921(c)(7)).  "Although lawmakers' statements during debate are generally not dispositive of legislative intent, they may properly be considered as part of the contemporaneous legislative history."  *Id.* (citing *Bd. of Revision of Taxes v. City of Phila.*, 4 A.3d 610, 624 n.10 (Pa. 2010); *Commonwealth v. Wilson*, 602 A.2d 1290, 1294 n.4 (Pa. 1992)).

not precisely mirror the MPC's afterborn-heirs provision,[3] the comment of the Joint State

Government Commission ("the Commission")[4] in its 1947 report appears to reflect the intent to

have no substantive difference from the MPC version.[5]  In any event, because FET was not a

possibility at the time of the enactment of the relevant state provision, the General Assembly

could not have intended that the statute address the issue of posthumous FET at the time it

adopted the afterborn-heirs provision.  *See,e.g., Finley v. Astrue*, 270 S.W.3d 849, 853-54 (Ark.

2008) (stating that "the General Assembly . . . did not intend for the statute to permit a child,

created through *in vitro* fertilization and implanted after the father's death, to inherit under

intestate succession" because "the instant statute . . . was enacted in 1969, which was well before

the technology of *in vitro* fertilization was developed"); *see also In re Certified Question*, 825

N.W.2d at 571 (holding twins who were not in gestation until after father's death could not

---

[3] MPC § 25 states: "Descendants . . . of the intestate, begotten before his death but born thereafter, shall inherit as if they had been born in the lifetime of the intestate and had survived him. With this exception, the descent and distribution of intestate estates shall be determined by the relationships existing at the time of the death of the intestate."  Carpenter, *supra*, p. 363.

[4] Under 46 Pa. C.S. § 65, "[t]he entire membership of the House of Representatives and the entire membership of the Senate shall constitute a continuing joint legislative commission, to be known as the Joint State Government Commission."  The Commission's powers include investigating and gathering information useful to the General Assembly and committees and reporting to the General Assembly or committees of the legislature "such findings and recommendations accompanied with such drafts of legislation as it deems necessary for the information of and consideration by the General Assembly."  *Id.* § 66.  "The comments or report of the Commission . . . which drafted a statute may be consulted in the construction or application of the original provisions of the statute."  1 Pa. C.S. § 1939.

[5] Section 2104(4) did not include the second sentence of the MPC afterborn-heirs provision because the rule was already "well-established."  1947 JSGC Report at 15; s*ee* 20 Pa. C.S.A. § 2104(4) cmt. (1947); Carpenter, *supra*, p. 364.  In particular, "[n]o general provision [was] made to the effect that heirs and next of kin with this exception are determined as of the date of decedent's death because it [was] well established that real estate descends directly to heirs at the moment of death . . ., and that the equitable rights of the next of kin in personalty [were] similarly vested at the moment of death."  20 Pa. C.S.A. § 2104(4) cmt. (1947).

inherit from father and were not qualified "children" within meaning of state intestacy law defining qualified "child" as natural issue of both spouses if born or conceived during marriage).

While it appears that the General Assembly has considered probate-related issues arising from assisted reproduction technology, it also appears no laws have been passed granting inheritance rights to children born following posthumous FET.  Most recently, section 2104 was amended by the Pennsylvania legislature in 2002; however, this amendment did not alter the afterborn-heirs provision.  *See* 20 Pa. C.S.A. § 2104 cmt.

In May 2008, the Commission's Subcommittee on Assisted Reproductive Technologies submitted a report recommending modifications to Pennsylvania's domestic relations and intestacy laws to address legal problems that may arise when children are born following the employment of assisted reproductive technology.  *See* Report of Subcommittee on Assisted Reproductive Technologies, *Proposed Pennsylvania Assisted Reproductive Technologies Act* (May 2008).  Nonetheless, despite the General Assembly's awareness of the posthumous employment of assisted reproductive technology, *see, e.g., id.* at 6, and despite the ambiguity of Pennsylvania's intestacy law, in particular section 2104(4)'s application to circumstances such as those in this case, the General Assembly has not amended the relevant law in an attempt to clarify this issue.  *See* 20 Pa. C.S.A. § 2104(4).  Where the legislature has decided not to add to the law, courts should limit their rulings accordingly.  *Pilchesky*, 88 A.3d at 965.  Here, the General Assembly's inaction in amending its laws to address the issue of children born following posthumously employed FET does not support plaintiff's request to reverse the Commissioner's final decision denying benefits in this case.

### (ii)      Pennsylvania Case Law on Legal Status of Embryos

Although Pennsylvania courts have yet to rule on the legal effect of children born following posthumous FET as it relates to intestacy law, courts have considered the legal status of embryos in the context of Pennsylvania criminal, tort, and domestic relations laws.  Since C.S. and J.S., who were born following posthumous FET, were in existence as cryopreserved embryos at the time of the decedent's death, the legal rights afforded to embryos by Pennsylvania courts would appear to be relevant to a prediction of how the Pennsylvania Supreme Court would rule on the issue before this Court.  Indeed, the Commission's comment to section 2104(4) confirmed that "the equitable rights of next of kin in personalty are . . . vested at the moment of death."  20 Pa. C.S.A. § 2404(4) cmt.

In *Reber v. Reiss*, 42 A.3d 1131 (Pa. Super. 2012), the Court was called to determine whether to grant a husband's request to destroy the couple's cryopreserved embryos following their divorce.[6]  The Court found the embryos were marital property subject to equitable distribution and weighed the husband's interests against the wife's interest.  In its reasoning, the state appellate Court noted Pennsylvania's public policy against forced procreation protecting the rights of parents, but the Court did not address whether the embryos, or prospective children who could be born from implanting those embryos, had rights and interests independent of the parents.  *Id.*

---

[6] Although the parties in *Reber* acknowledged the cryopreservation of "embryos" in their signed consent form, the Pennsylvania Superior Court in *Reber* referred to these embryos as cryopreserved "pre-embryos."  *See, e.g., Reber*, 42 A.3d at 1134.  In any event, it appears that the husband and wife underwent the IVF process resulting in 13 embryos.  *Id.*  After observing that "the contested disposition of frozen pre-embryos in the event of divorce is an issue of first impression in Pennsylvania," *id.* at 1134, the Court pointed out: "The cryopreservation of pre-embryos presents novel legal issues, 'primarily because of the potential for the passage of several years between fertilization and later transfer and subsequent birth of the child.'"  *Id.* (quoting 17 Joanne Ross Wilder, *West's Pennsylvania Law Family Practice and Procedure* § 26:3 (7th ed. 2008)).

In *Commonwealth v. Bullock*, 913 A.2d 207, 210 (Pa. 2006), the Supreme Court of Pennsylvania pointed out that the Crimes Against the Unborn Child Act, 18 Pa. C.S. §§ 2601–2609, added Chapter 26 to the Pennsylvania Crimes Code and "created several new offenses designed to protect unborn children from unlawful injury or death." The Court further found that the relevant Crimes Code definition of the term unborn child included all stages of gestation from fertilization to live birth. *See Bullock*, 913 A.2d at 212; *see also* 18 Pa. C.S. §§ 2602, 3203 (defining the terms "unborn child" and "fetus" as "an individual organism of the species homo sapiens from fertilization until live birth"). The Pennsylvania Supreme Court further elaborated that the statutory language of the Act which protected unborn children "imposed criminal liability for the destruction of a human embryo or fetus that is biologically alive." *Id*. at 212-13.

In the context of tort actions, although the Pennsylvania Supreme Court has "recognized a cause of action for a fully developed stillborn," *see Coveleski v. Bubnis*, 634 A.2d 608, 609 (Pa. 1993) (citing *Amadio v. Levin*, 501 A.2d 1085 (Pa. 1986)), the Court has declined to extend liability under Pennsylvania's wrongful death and survival acts to allow for a cause of action on behalf of "a non-viable fetus," since such an action may only be maintained on behalf of a "natural person." *Id.* at 609. Significantly, in rejecting a cause of action on behalf of a non-viable fetus, Pennsylvania's Supreme Court explicitly "**defer[red] to [the Pennsylvania] legislature** for any substantial expansion of the scope of liability." *Id.* at 610 (emph. added); *Akl v. Listwa*, 741 F. Supp. 555, 557-58 (E.D. Pa. 1990) (where the Court was called to "predict how the Pennsylvania Supreme Court would decide [the] issue," with "no controlling precedent," the Court observed that "courts – especially a federal court – should hesitate to intrude where the legislature has not spoken.").

Here, at the time of Mr. Seaman's death, C.S. and J.S. existed as embryos.  Neither party has cited to a case applying Pennsylvania law indicating that an unborn child not yet in gestation may be protected with legal rights of their own.  Rather, any instances in which Pennsylvania courts have taken steps to provide legal protections for unborn children appear to involve unborn children in gestation.

### (iii)    *Relevant Case Law in Other Jurisdictions*

In *Bosco ex rel. B.B. v. Astrue*, 2013 WL 3358016 (S.D. N.Y. Feb. 19, 2013), *adopted in relevant part*, 2013 WL 3357161 (S.D. N.Y. July 3, 2013),[7] the plaintiff and her husband underwent *in vitro* fertilization, and they signed consent forms giving rights "to determine disposition" of the cryopreserved embryos to the surviving spouse in the event of death.  *Id.* at *1.  More than a year after her husband passed away, the plaintiff underwent an embryo transfer procedure utilizing some of the remaining aforementioned embryos, leading to her son's birth approximately 6 months later.  Following the denial of child's survivor insurance benefits by the Commissioner of Social Security, plaintiff appealed to the District Court.

As in this case, in *Bosco* the Court was asked to construe the relevant state afterborn-heirs provision as it applied to a child born following posthumous embryo transfer.[8]  In affirming the

---

[7] The District Court "adopt[ed] all aspects of the Report, except for the Report's reasoning on the issue of when a 'final decision' [of the Commissioner of Social Security] is rendered."  *See Bosco*, 2013 WL 3357161, at *2.

[8] Although in *Bosco*, the relevant term from the state provision in question was "conceived," and not "begotten," the arguments made in support of the parties' respective positions resemble the arguments made in this case.  The plaintiff in *Bosco* argued that conception occurred when the embryos were created, *see Bosco*, 2013 WL 3358016, just as plaintiff here argues that C.S. and J.S. were begotten when the embryos were created, *see* Oral Arg. at 9.  Similarly, the Commissioner in *Bosco* argued that conception occurred when "in gestation" or "in utero," and the Commissioner here argues that begotten means in gestation or "in the womb," *see id.* at 10-11.

Commissioner's denial of child's insurance benefits, the Court in *Bosco* found that since the child was "posthumously conceived," he did not "qualify as an intestacy heir" under the relevant state afterborn-heirs provision.  *Id.* at *12.  Significantly, the Court persuasively pointed out:

> We recognize that the New York courts have not yet addressed the reach of the intestacy statute in the precise set of circumstances that we face, and it is certainly possible that they may choose to read conception more broadly, in light of medical advances.  That choice, however, should be theirs or the province of the . . . State legislature.

*Id.*[9]

Similarly, in *Finley ex rel. W.F. v. Astrue*, 270 S.W.3d 849 (Ark. 2008), plaintiff and her husband underwent IVF resulting in embryos, and their son was born following the transfer of the embryo into plaintiff's womb after the death of her husband.  *Id.* at 850.  The plaintiff in *Finley* appealed to the U.S. District Court for the Eastern District of Arkansas from the denial of child's insurance benefits by the Commissioner of Social Security.  The District Court, in turn, certified to the Supreme Court of Arkansas, in accordance with the Arkansas Supreme Court Rules, the question of whether a child who was born under such circumstances would inherit from the father under the relevant state intestacy law.  *Id.* at 850.  As in *Bosco*, the relevant state afterborn-heirs provision included the term "conceived."  *Id.* at 851.  In answering the certified question in the negative, the Arkansas Supreme Court pointed out:

> It is clear from the statute that in order to inherit through intestate succession as a posthumous descendant, the child must have been conceived before the decedent's death.  However, the statutory scheme fails to define the term "conceived."  While we

---

[9] In amending its intestacy statute the year following this decision, the New York legislature clarified in a section entitled "Inheritance by children conceived after the death of a genetic parent" that posthumously conceived children do not qualify as intestate heirs unless "the genetic child is in utero no later than twenty-four months after the genetic parent's death or born no later than thirty-three months after the genetic parent's death."  N.Y. Est. Powers & Trusts § 4-1.3(b)(4) (McKinney 2014).

could define that term, we find there is no need to do so, as we can
definitively say that the General Assembly, in enacting [the
relevant state Act], did not intend for the statute to permit a child,
created through [IVF] and implanted after the father's death, to
inherit under intestate succession.  Not only does the instant statute
fail to specifically address such a scenario, but it was enacted in
1969, which was well before the technology of [IVF] was
developed.

*Id.* at 853.  The *Finley* Court further stated: "Our role is not to create the law, but to interpret the

law and to give effect to the legislature's intent. . . . [IVF] and other methods of assisted

reproduction are new technologies that have created new legal issues not addressed by already-

existing law."[10]  *Id.* at 854 (citations omitted).

In *Beeler v. Astrue*, 651 F.3d 954 (8th Cir. 2011), the plaintiff's husband had his sperm

preserved, and he signed a form bequeathing his semen to the plaintiff, authorizing use of it in

the event of his death, and agreeing to paternity of and child support for any resulting child.  *Id.*

at 956-57.  Following the death of her husband, the plaintiff conceived through artificial

insemination of her husband's sperm and gave birth to a child.  *Id.* at 957.  The Eighth Circuit

was called upon to construe an afterborn-heirs provision in Iowa's intestacy law, which

provided: "[H]eirs of an intestate, **begotten before the intestate's death but born thereafter,**

**shall inherit as if they had been born in the lifetime of the intestate** and had survived the

intestate.  With this exception, the intestate succession shall be determined by the relationships

existing at the time of the death of the intestate."  *Id.* at 965 (emph. added).

---

[10] Therefore, the *Finley* Court "strongly encourage[d] the General Assembly to revisit the
intestacy succession statutes to address the issues involved in the instant case and those that have
not but will likely evolve."  *Id.* at 855.  Recently, in April 2015, the Arkansas legislature adopted
a bill permitting a posthumously conceived child of a decedent to inherit from the decedent if
there was prior consent from the decedent and the child was conceived within a year of the
decedent's death.  *See* Ark. Code Ann. 28-9-221; *see also* H.B. 1904, 90th Gen. Assemb., Reg.
Sess. (Ark. 2015).  The recent provision was made "retroactive to December 1, 2009, solely for
the purpose of establishing a posthumous child's entitlement to Social Security benefits under
the federal Social Security Act, 42 U.S.C. § 402(d), deriving from the decedent."

The Eighth Circuit defined "begotten" as "to procreate" or "to produce," which the Court found did not apply to that case since the child had not been conceived until after the husband's death.  *Id.*  For the same reason, the Court determined that the husband's posthumous child did not have an "existing relationship" with the husband at the time of his death.  *Id.*  The Court of Appeals also noted that the Iowa statute permitting a "biological child [to] inherit[] from her biological father if . . . the child has been recognized by the father as his child" was not applicable because "a child not yet in existence can[not] be 'recognized' by a man as 'his child.'"  *Id.*  Therefore, the Eighth Circuit affirmed the district court's decision to deny survivor insurance benefits sought by the plaintiff on behalf of her child.[11]  *Id.*

Thus, in both *Bosco* and *Finley*, where births of children resulted from posthumous transfers of embryos which had been in existence before the death of the genetic father, the Courts ruled against the plaintiffs seeking to establish that the posthumous children were afterborn heirs of the respective decedents.  While the relevant state afterborn-heirs provisions in those cases did not include the term "begotten," persuasive reasoning provided in support of those decisions applies here.

Furthermore, in *Beeler*, although the child was born following posthumous artificial insemination of plaintiff's husband's sperm, and not as a result of posthumous FET, the relevant state afterborn-heirs provision included terms similar to Pennsylvania's provision, as they were both modeled after the MPC, *see* Carpenter, *supra*.  As in *Finley* and *Bosco*, the Court in *Beeler* affirmed the denial of child's insurance benefits.  Notably, the *Beeler* Court defined the term

---

[11] While the plaintiff's case was pending before the Court of Appeals, the Iowa legislature enacted a law to allow posthumously conceived children to inherit as intestate heirs "under certain circumstances."  *Id.* at 966 n.4; *see* Iowa Code § 633.220A (2011).  However, the statute did not apply retroactively, and hence, was not considered by the Eighth Circuit.  *See Beeler*, 651 F.3d at 966.

begotten in terms of conception, which was the term the Courts in *Finley* and *Bosco* were called to construe.[12]

### C.  Application of Pennsylvania's Afterborn Heirs Provision

In predicting how the Pennsylvania Supreme Court would rule in applying the afterborn-heirs provision to the circumstances in this case, this Court must apply the rules of statutory construction which guide the state Supreme Court, and those rules direct the Court to seek to effectuate legislative intent, *see English*, 664 A.2d at 87 (citing 1 Pa. C.S. § 1921(a)).  Further, as the Pennsylvania Supreme Court has stated, and as the Courts in *Bosco* and *Finley* appeared to recognize, the Court "should not interpose [its] views on public policy for those of the

---

[12] Plaintiff cites *In re Estate of Kolacy*, 753 A.2d 1257 (N.J. Super. Ct. Ch. Div. 2000), a New Jersey trial court decision, in support of her position.  Initially, it is noted that although the husband in *Kolacy* had "harvested his sperm" prior to his death, IVF was not performed until after the husband passed away, and following the IVF, twins were born.  *Id.* at 1258.  Furthermore, the New Jersey afterborn-heirs provision at the time of the decision provided, "Relatives of the decedent conceived before his death but born thereafter inherit as if they had been born in the lifetime of the decedent."  *Id.* at 1260 (quoting N.J.S.A. 3B:5-8).  Thus, the underlying facts *and* the relevant provision being addressed in *Kolacy* are distinguishable from this case.  Even more significant, however, as the Nebraska Supreme Court pointed out in *Amen v. Astrue*, 822 N.W.2d 419, 423 (Neb. 2012), the trial court's decision in *Kolacy* "ignored the [relevant] statute's literal meaning to create a favorable result for [the plaintiff]."  In particular, the chancery court judge in *Kolacy* chose to ignore the meaning of the New Jersey afterborn-heirs provision which applied to relatives "**conceived before [the decedent's] death**," *see Kolacy*, 753 A.2d at 1260 (quoting N.J.S.A. 3B:5-8) (emph. added), and instead held that as long as "a child is indeed **the offspring of a decedent**," "it seem[ed] to [him] that . . . we should routinely grant that child the legal status of being an heir of the decedent, unless doing so would unfairly intrude on the rights of other persons or would cause serious problems in terms of the orderly administration of estates," *id.* at 1262 (emph. added).  Following *Kolacy*, the New Jersey legislature amended its afterborn-heirs statute.  *See* N.J. Stat. Ann. § 3B:5-8 (2005) ("An individual in gestation at a particular time is treated as living at that time if the individual lives 120 hours or more after birth.").  In any event, the New Jersey trial court's decision in *Kolacy* does not provide persuasive reasoning in support of determining how Pennsylvania's Supreme Court would rule in this case, keeping in mind that the state Supreme Court must "at all times seek to ascertain and effectuate the legislative intent underlying the enactment of the particular statute" at issue," *see English*, 664 A.2d at 87 (citing 1 Pa. C.S. § 1921(a)), and "interpret statutes, not re-write them," *see DiGirolamo*, 312 A.2d at 385.

legislature" and should only "interpret, not re-write, state statutes."  *See DiGirolamo*, 312 A.2d at 385; *see also Bosco*, 2013 WL 3358016, at *12; *Finley*, 270 S.W.3d at 853.  In her brief, "Plaintiff acknowledge[s] that the place of the courts is not to legislate."  *See* Pl.'s Br. (Doc. 41) at 9.

It is clear from the relevant Pennsylvania provision that in order to inherit through intestate succession, a person must have been begotten before the decedent's death, *see* 20 Pa. C.S. § 2104(4), and the statutory scheme fails to define the term "begotten."  While this Court could define the term "begotten," there is no need to do so since it can definitively be said that the General Assembly, in enacting the relevant provision, did not intend for the statute to permit a child, born following FET into the womb of the child's mother several years after the father's death, to inherit under intestate succession.  As the *Finley* Court stated, "[n]ot only does the [relevant afterborn-heirs provision] fail to specifically address such a scenario, but it was enacted . . . well before the technology of [IVF] was developed," *see Finley*, 270 S.W.3d at 853.  In that light, the Pennsylvania Supreme Court would not find that the legislature intended children born under the precise circumstances as C.S. and J.S. were entitled to inherit intestate from the decedent.  As the Arkansas Supreme Court in *Finley* stated in response to the federal court's certified question similar to the issue pending here: "Our role is not to create the law, but to interpret the law and to give effect to the legislature's intent. . . . [IVF] and other methods of assisted reproduction are new technologies that have created new legal issues not addressed by already-existing law."  *See Finley*, 270 S.W.3d at 854.

It is further noted that were the Court to construe Pennsylvania's afterborn-heirs provision to cover children born under the precise circumstances C.S. and J.S. were born, such an interpretation would mean that, as long as any cryopreserved embryos from the decedent exist

17

as a result of IVF, there would be no definite time-limit after the death of the decedent during which the number of intestate heirs could be known.  As plaintiff's counsel conceded at oral argument, in this case such a construction of the statute would mean the very real possibility of other children becoming intestate heirs following FET at some indefinite point in the future.  The Court must "resist the urge to extend . . . endlessly" the possibility of potential intestate heirs and "defer to [the] legislature for any [such] expansion."  *Coveleski*, 634 A.2d at 610.

Indeed, "it is manifest that the prompt, orderly, and efficient administration of decedents' estates is a primary concern of the Commonwealth."  *In re Mellon's Estate*, 314 A.2d 500, 502 (Pa. 1974).  Thus, in Pennsylvania, it is "well established" that "the equitable rights of the next of kin in personalty are . . . vested at the moment of death."  *See* 20 Pa. C.S.A. § 2104(4) cmt. (citing *Brothers' Estate*, 40 A.2d 156, 157 (Pa. 1944)); *see also Brothers' Estate*, 292 A.2d at 157 ("[t]he rights of the distributees are fixed at the instant of death").  To construe the relevant state provision in this case the way plaintiff requests would clearly be inconsistent with that primary concern and would appear contrary to the "well established" principle observed in the Commission's comments to the afterborn-heirs provision.

There would appear to be nothing "prompt, orderly, [or] efficient" about construing Pennsylvania's afterborn-heirs provision as entitling children to inherit intestate where they are born as a result of frozen embryo transfers into their mother's womb four years after the death of their father, much less an indefinite number of years after the decedent's death.  Thus, it appears public policy would weigh against plaintiff's suggested construction of the afterborn-heirs provision.

Since the Pennsylvania Supreme Court would not find that the Pennsylvania legislature intended children born under the precise circumstances in this case were entitled to inherit

intestate from the decedent, C.S. and J.S. do not qualify as children who are entitled to receive child's survivor insurance benefits under the Act.  Similarly, plaintiff is not entitled to mother's insurance benefits.  *See* § 402(g)(1)(E); *see also supra* note 1.


### 4.  CONCLUSION

Under the fourth sentence of 42 U.S.C. § 405(g): "The [district] court shall have power to enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  § 405(g) ("Judicial review"); *see Matthews*, 239 F.3d at 593.  Here, since the ALJ's findings are supported by substantial evidence and were made according to correct legal standards, his decision should be upheld.  *See Fargnoli*, 247 F.3d at 38.  Accordingly, defendant Commissioner's final decision denying benefits is affirmed, and a Judgment to that effect follows.